Gregory. Mr Weisenberg. Oh, you're on mute. You're on mute. Okay, right now. Sorry about that. Thank you, Your Honor. May it please the court. My name is Saul Weisenberg. I represent the appellant Troy Gregory. We raised two issues on appeals, sufficiency of the evidence and impropriety of the closing argument. Today, given the time limitations, I'm going to focus on the on the closing, but obviously will answer any questions the court has. And there's certainly a connection between the weakness of the evidence and the harm from this improper conduct. I don't mean to take you off track, but since you're going to focus on the closing, which I'm happy to hear about, can I just ask you one question, which understandably wasn't addressed in the breeze on the sufficiency of the government has three different theories in their indictment. You've challenged all three on the sufficiency of the evidence. Do you have to prevail on all three? In other words, since there was a general verdict, um, on uh, and then the four, uh, you know, the four different counts were all subsumed in each of those three theories. Do you have to prevail on all three? Or is the sufficiency on one enough to support the verdict on the sufficiency challenge? Well, it certainly would be enough for the particular count involved are it would be enough to support that count. I believe I didn't address it. You're right. But the four accounts are all for four different participating banks. And so that each of those hearings on all three of those theories were asserted against each of those four victim banks. And so that therein lies my question. Since all of those three theories were collectively, uh, asserted against on each of those counts, I'm wondering if we would have to, uh, uphold the verdict, the judgment of guilt on the sufficiency challenge. If any of those if any of those three theories of guilt were sufficient because each of those all of those theories were just collectively asserted against each of those banks. That makes I hadn't thought about it. I hadn't thought about it, Your Honor. The banks certainly are not just the victim. Banks are certainly not distinguish distinguishable. In other words, in terms of the evidence, they're all in the same boat. The different theories you're talking about are different counts. And, uh, my my guess is that if it's sufficient with respect to a particular count, uh, that that's enough for that count, and the other counts would be thrown out. But I don't have a research student. I don't know for sure. Okay, thank you. And I apologize for taking a credit apology necessary. Um, Wittenberg, Your Honor's involved in imaginary admissions in the form of a letter that mischaracterized the evidence in an inflammatory way. Here we have inflammatory admissions, really confessions in the form of a speech in which a repentant Gregory apologizes to his victims for his crime and his crimes and his greed. It's also involves mischaracterization of the evidence and is also handled in an inflammatory way. Both cases, there are invented facts. This is actually worse than Wittenberg because, uh, Wittenberg was civil. It was an admission in a civil case. This is a criminal case involving a criminal, uh, criminal defendant and appellant who was in prison. Um, the comments here treaded, treaded actually very closely on a comment on the failure to testify. I believe that there were, uh, this alone, this that's made up where Mr Gregory, uh, in the form of the prosecutor is made to confess, and the jury is told. In effect, he should have confessed. This is alone enough under Wittenberg, uh, to reverse this case because the improper closing. But you've got two significant things. In addition, you've got a plethora of individual admissions that Mr Gregory has been, uh, makes through the prosecutor that have no support in the evidence. And you have burden shifting that is that is very, that is, uh, very harmful and shifts the whole theory of the case. We talked about it. I want to regurgitate the brief, but I want to stress the importance of these individual collectively, these individual misrepresentations that were made. Uh, there's no testimony whatsoever about that. He doesn't say desperate times required desperate measures. He doesn't. There's no scintilla of evidence that he's worried about his job. There's no evidence whatsoever that he's worried about his bones. Uh, there is no evidence whatsoever that he stole from the draw. I might point out that on nine different cages, occasions, the money washing money. Those are the words of a criminal of a thief. Even if you believe, even if you don't like what happened with the draw, it's improper to make those references. There's no suggestion that Gregory himself is ever stealing any money. Uh, there's no evidence that, uh, there's no evidence that Mr Duncan that the donation of lumber had anything to do with this case. There there is no. Can I ask you about that, Mr Weisenberg? And again, we're interrupting. But on Mr Duncan, it does seem to me that the government has at least a plausible argument that part of the concern of B. B. O. K. And the victim in the participating banks is that they say that that they all wanted the principles of the company to have skin in the game. And so that it was important. One of the important factors was that if they were only going to be 15% liquidity invested that Duncan had to have additional skin in the game by donating that lumber, uh, you know, to to the enterprise. And so that would be additional skin in the game from the counter argument that there was no requirement that he would donate that lumber without being paid. But that's a disputed fact, isn't it? I don't believe it is a properly disputed fact. The documentary evidence is 100% clear that that Duncan was to be paid. That's that's that's part of the whole, uh, the whole arrangement of the loans that big deal was going to be paid is the and that big deal was going to turn around and pay Duncan for the lumber. Now, the lumber was very important. They had to make sure that the lumber was there and and lumber got delivered. But the lumber was not a capital contribution. That's that's very clear. As you pointed out in the brief, there's a there's a trail of evidence showing that the bank paid for the lumber and Mr Ellis wanted to make sure that the lumber was really there and that Duncan had paid for. So I don't believe that's a disputed fact, but I think it's a very critical misstatement by by the prosecutor. The third thing I want to talk about, uh, the third problem, despite the highly prejudicial confession itself and the 12 or 15 specific things that aren't supported by the record is the burden shifting involved. It's very clear here that Mr Gregory has one duty, uh, and that duty is to tell the truth to Craig Ellis. Let me put it to you this way, not to not to lie in his documents, but to fully disclose and tell the truth to Craig Ellis that B. B. O. K. B. B. O. K. Is the sole agent of the participant banks. B. B. O. K. stands in the shoes of the victim banks. So when Troy Gregory says something to victim banks, and by the way, it is the government's burden to prove that he didn't tell the truth or tell everything that is Mr Gregory to Mr Ellis. That's their burden. Mr Gregory doesn't have to prove that. But as a matter of fact, the government's own evidence in the form of emails and testimony from various people shows that there was quite a lot that Mr Gregory did inform Mr Ellis of, including the fact that the liens weren't cleared before April 17th. Uh, wasn't there? Wasn't there evidence that Mr Gregory reviewed the documents provided to the participating banks? And if if that information provide to the participating banks was incorrect, he would know that the participating banks were being inadequately before informed or misinformed. Wouldn't that be reasonable inference by the jury? If there was actually evidence that they reviewed it, your honor, but keep in mind, with one exception, which which I think is what your honor is talking about. With one exception, there is not evidence that anything sent any document sent to the participant banks by B. B. O. K. Crossed Troy Gregory's The only thing the government has is that on February 1st, 2008, Craig Ellis emailed a copy of the presentation he and Jean Daly made to the board of B. B. O. K. Right when they're still trying to get the loan approved by B. B. O. K. He sends a copy emails a copy to Troy Gregory and says, Here's our Troy. Here's our presentation. There's no evidence that Troy Gregory open that email, much less looked at what was there. And, um, furthermore, this is very early on. This loan doesn't close until April 28th. You and B sent their UNC Center. Their loan document is dated December 5th. That's when they approved the loan. You would be and he's getting an email from Craig Ellis on February 1st. The deal changes considerably between February and April. So no, I don't think if there if there was evidence that Gregory reviewed these documents, that would be a different story. But you don't have that here. Let me ask another question about the closing argument. Um, you've you've mentioned a variety of things such as misleading information, shifting burden of persuasion. Um, what were your objections that were made during the closing argument? Well, what do we perhaps for plain air, if anything, is everything you hear something argued to the judge with respect to the closing argument? I believe so. Except the words you're shifting the burden of proof weren't other. But keep in mind that I believe this was properly preserved. My God, trial counsel objected three times, and the judge finally told him, Sit down and shut up. You've got a running objection. And if you look at what he's objecting to the first time he's right when he begins, and he's setting up this fake boardroom scene, he objects based on that judge doesn't even give an instruction. Then the second objection is after the prosecutor is making specific misstatements. He's having Troy Gregory say I've had to hide things from you so far matters such as that he objects then, and he says this isn't in the evidence. This wasn't said. And the same thing happens a third time. What sets him off is the comment. I think desperate times call for desperate measures, and the judge says enough. So I think he got the point across. I don't think we can say he hasn't preserved. He hasn't preserved his error. I had set aside three minutes for rebuttal, so I'm going to hold on to that. And unless there any further questions right now. Thank you, Mr Weisenberg. Thank you, Mr Mr Valentini. Good morning. May it please the court. My name is Francesco Valentini for the United States. Chief Judge Robinson correctly rejected Gregory's sufficiency and improper argument claims in the proceedings below. And two judges of this court reached the same conclusion just last June when they found that Gregory's appeal does not even quote quoting from that order present a substantial question that is likely to result in reversal or a new trial. Those consistent determinations are correct, and this court should reach the same conclusion in this appeal. In my time before the court today, I would like to touch very briefly on the question that Judge Bachrach just asked my friend on the other side about the sufficiency claims and then devote the rest of the remainder of the argument to the improper argument claim, unless the court has any further questions about the sufficiency claims. As to whether our indictment and the proof of trial was based on three distinct facts that Gregory misrepresented as part of the scheme. Your Honor's question was, uh, we need the need. The jury need to be unanimous as to each one of them, or does there need to be sufficient evidence as to each one of them? And the answer is no. So long as there's sufficient evidence as to one of them, we have sufficiently established a scheme to the fraud, which is the only, um, ultimate issue of fact that the As to my friend's on the other side's response, which I think seemed to tether each count to a different misrepresentation. No, the bank fraud counts are each tethered to a different victim bank. But the actionable misrepresentation alleged in the indictment and proved at trial for each of those substantive bank fraud counts are the same. And the basis is for each count all three representations. So any sufficiency of any one of those misrepresentations would suffice to sustain the jury's verdict on the sufficiency. Unless your honors have any further questions about the sufficiency claim, I would like to discuss a little bit improper argument claim. Like any defendant pressing an improper argument claim, Gregory has a steep bill to climb. In this case, you must show that the infected the trial with unfairness. That is just to show that the jury not was not able to fairly judge the evidence in light of the prosecutor's conduct. The prosecution's closing argument in this case, however, was proper, especially on its flexible standards. This was and this is important. A fraud case like any fraud case, any particular fraud case that is based on half truth, uncorrected, uncorrected, half truth are the government's proof must necessarily turn on establishing falsity and materiality. And both falsity and materiality are essentially quintessentially exercises in contrast. Doesn't that support Mr Weissenberg's argument that the argument here is even more egregious than in Wittenberg, where you didn't have a fraud claim, and the jury is charged with deciding whether or not Mr Gregory is guilty of a scheme to deceive the victim banks. And the whole scheme is is is predicated on Mr Gregory's making false statements to be be okay. And so he was prohibited from having contact with the victims, the victim banks. And here the whole closing argument 20 of the 28 minutes is devoted to him having this direct presentations opening with. These are things that I didn't tell you that I should have. Well, he couldn't have even he was prohibited from even communicating with those victim banks. So what's the nature of the charge that this is a criminal case involving fraud? Doesn't that aggravate the impropriety as opposed to the No, you're right. I think I think to the contrary. I think the fact that this is a fraud claim makes the really calls for hypothetical reasoning and making a hypothetical argument to the jury. There would have been no. But even though the hypothetical is predicated on on actual dialogue that not only didn't happen, but couldn't have happened. Okay, so as as that the fact whether there was a strict prohibition was a contested fact of trial. But beyond that, the fact that the hypothetical, the only aspect of the hypothetical, which is which was even arguably objectionable to answer your question directly is the fact that the government hypothesized a direct meeting. And the my friend on the other side argues that well, that could have the jury as to the roles of Gregory and the VOV. Okay, and the participant bidding back banks. But as to that fact, the respective roles, I think that the government was extraordinarily clear in setting up the hypothetical, that that was hypothetical, that the meeting did not happen and could not have happened. And other courts, for instance, I can cite cases from this 11th Circuit in Sixth Circuit in Abila versus Martin, 380, F3rd, 915. In those cases, the fact that a hypothetical conversation is hypothesized, this goes to the means of how the information could have been transmitted. But there was no plausible argument that there was any confusion on the part of the jury as to how the information was going to be transferred. The defense made a huge deal in their closing argument as to the fact that Gregory was not permitted to communicate directly with the banks. And there is really no reasonable claim of prejudice based on any confusion as to that issue. My point about the fraud claim being calling necessarily for a hypothetical reasoning goes to the elements really what was the government always required to show in a fraud case. And in a fraud case, the government is always required to show to ask the court the jury to hypothetical reasoning, for instance, for to prove materiality. We have we always have to ask the court the jury to hypothesize that the defendant actually conveyed whether it would be okay or some other way, the truthful information and what would the jury and what would the participating bank have done had they received truthful jury. So the essence of a fraud case calls for hypothetical reasoning in a way that first in Wittenberg, that was not the case. That was a negligent thing that does not call for hypothesizing a communication that didn't happen but should have happened, which is really the crux of any fraud by not a mission by failure to correct, which is the essence of this case, right? What about the eight or nine points that Mr Weisenberg has mentioned that there was literally no evidence for that? He's that he's that he made $100,000 bonus. Now that was in the evidence, but I'm probably gonna get fire. I was probably gonna get fired. I've read the transcripts. It's not a lick of testimony about that. Uh, I mean, all of the point, you know, three or four that was mentioned today, but Mr Weisenberg, there's more in his brief. Uh, the extend and pretend, you know, that phrase never appears in the transcript, and it's repeated as a chorus throughout the closing. What about these points that it's not only hypothetical dialogue that never took place, but he is the close. The prosecutor is literally making things up as he goes in closing argument. I mean, these are things that you can't infer from the evidence. There's no evidence about extend or pretend or, uh, you know, any of the points that that Mr Weisenberg's mentioned. You know, there's no evidence that Gregory used those part of that particular turn of phrase. But the fact that that is the essence of what it was doing was there was ample evidence that it was extending loans, new loans just to cover interest that was coming due on the existing loans. So there was plenty of overwhelming evidence that that was going on. The fact that the conversation, the hypothetical phrasing used a turn of phrase that Gregory himself did not use. That is true. That is part of the hypothetical. But that is precisely the kind of, um, hypothetical reasoning that supports the Sixth Circuit in the in the 11th in the case that I just mentioned to you approved of us to the motive question that you raised. There was, in fact, evidence a trial that Gregory's motive was to continue to be successful as a loan officer and that his motive was to continue receiving. Where would I like to find it? Okay, so, for instance, I would refer your honor to pages 13 38 into 13 39 of the appendix where Jean Daly, who was a loan officer for PBOK, uh, testified was asked what makes what are the responsibilities of a loan officer and what makes a loan officer successful? And she conveyed the fact that loan officers are responsible if loans if their loans, the loans that they work on issuing are not performing and that that's what makes a loan officer a good loan officer or a bad loan officer. And as you said, there's other performance and and here that dovetails with the trajectory of Gregory's own bonuses that confirmed that when his loans were performing, he was receiving $100,000 bonuses and then went down to 85,000 and then went down to zero in 2008. And now, with that backdrop, with that sort of understanding of a loan officer responsibilities, I would ask the court to consider the evidence in Gregory's circumstances in late 2007 as it was pondering the Blue Jay loan. At that time, his entire success on the entire Sutter loans and all this this very large portfolio of loans that he had handled for the Big D borrowers, well, the success of all those loans was wrapped up in finding a liquidity lifeline. Without the Blue Jay loan, which understandably Duncan called the golden goose, those loans would have failed. And so, against the backdrop of a loan officer's responsibility of Ms. Daly's testimony about what loan officers will make loan officers a good loan officer or a bad loan officer and the urgency to find this lifeline to get him out of this failing loans, I think there was plenty of evidence from which the jury could infer that the motive of Gregory was to save his job and continue receiving his bonuses that he had been receiving. And again, you know, the government does get to draw fair inferences from the evidence. And here there was plenty of evidence. And the Supreme Court in the Christopher Appearance cautioned courts against second-guessing statements made that enclosing argument and necessarily attributing the most possible damaging meaning to the words that are used by prosecutors in closing arguments. And we think that this case fell well within the latitude, the wide latitude that the prosecutors are allowed in closing arguments. I also wanted to touch on the harmlessness, the fundamental harmlessness of any perceived or arguable impropriety in this case. The evidence was overwhelming. Aside from any motives, the evidence of his guilt was overwhelming. Motive is itself, bless him, not an element of bank fraud. It is not an element of false bank entries. And also another aspect of the harmlessness inquiry that I really urge the court to consider. In this case, unlike in Winterberg, there was no indication of intuperative attacks on defense counsel. And importantly, there was a curative instruction that the jury, that the court, that the trial judge gave not once, not twice, but three times. Senator, to me like the judge was doing the opposite of curative instruction, wasn't, curative instruction is to cure a problem. Here the judge said that this is not evidence, and so it's perfectly proper what he's doing, the prosecutor is doing, to give an illustration, to give an example. And so it seems to me that the judge was kind of doing with the opposite of what we typically see in a curative instruction, where the judge is saying that there was an error here, and I'm telling you, disregard this. No, he was saying, no, what counsel's doing is perfectly fine, you know, keep going, keep doing what you're saying. I disagree, Your Honor. I think the jury instruction clearly directed the jury to make of counsel's argument what it was supposed to make, to not consider it as evidence, right? And so he didn't say this was wrong, and we maintained that that was correct, that it shouldn't have stopped it, but he did say implied, to the extent that there's anything that goes, that you perceive as going beyond argument, take it for what it's for. It's just counsel's argument. And that kind of instruction was not given in Wittenberg in response to the specific objection, and that really sets this case aside from Wittenberg, as does the fact, as I mentioned before, that this is a fraud case that inherently calls for hypothetical reasoning. Again, there would have been nothing objectionable if we had urged the jury to just look at, just imagine that Mr. Gregory said X, Y, and Z, or made sure that the participants received information X, Y, and Z. That hypothetical would be the hypothetical. We reframed it in terms of a conversation, just to make it more understandable to the jury, but there was no prejudice that stems from that reframing from the third person to the first person. As I mentioned before, prosecutors are entitled to wide latitude in framing their hypotheticals, in framing their closing arguments for a jury. Unless your honors have any further questions, we would ask that the court affirm the judgment and the conviction of Mr. Gregory. Thank you, counsel. Mr. Wittenberg, you have reserved some time. Let's see how much. Okay, not quite your three minutes, but that should be adequate. Okay. I'm ready to go. And I'm Weisenberg, not Wittenberg. That's okay. But... Oh, my God. I'm sorry. Don't take my time away. Don't take my time away. I don't know where I got the name Wittenberg. I can't possibly... I'm sorry. I do want to do one thing real quickly, because we haven't cited this. I'm going to have to talk about it super quick. It's Act 6 at 1353 through 1356. It's from the testimony of Gene Daley, who was the former loan officer at the bank. We mentioned in our brief, and I want to stress again here, this is planned. This isn't in response to any outrageous comment. This is a planned argument by the prosecution to shift the burden and to do other things, and it goes back to the trial. If you look at the... I can't go into it in detail, but if you look at the testimony there and what the prosecutor is doing with the three different versions, there are three different versions of that loan offering, and only exhibit 153A. We've got the abside in our brief. That's the only one that goes to the participant banks. But what the prosecutor does with Gene Daley, he basically fools her and gives her the wrong version, and gets her to say there's a 15% cash down payment. Now, the evidence requirement, the evidence is unequivocal that that never went to the participant banks. That's not in the final loan document. But what the prosecutor did with her shows the planning here. And by the way, on the burden shifting, who's the very first witness the prosecution puts on? They put on Kay Finn, who's a senior risk examiner for the FDIC, and she gives a definition of organizing an originating bank that has no relationship to the kind of participation loan at issue here, and it's referenced in the indictment, and it has to be cleared up on cross-examination by defense counsel. But again, it shows they're trying to shift the burden from the very beginning. There is no evidence whatsoever that Troy Gregory ever joked about extending and pretending, worried about his bonus, worried about anything else, and that goes directly to his fraudulent and alleged fraudulent intent. And I don't know where counsel gets the difference that it's okay to give a false hypothetical in a fraud case, but not in a negligence case. I don't understand that. I see my time is up. Any questions from either member of the panel? No? Okay, thank you. Case is submitted and counsel are excused.